**DEBRA WHITE CRIMINAL DEFENSE SPECIALISTS**
Debra S. White (SBN 202778)
26565 Agoura Rd, Ste 200
Calabasas, CA 91302-1990
Telephone: 310.424.5010
Email: debra@dwhitecriminaldefense.com

**LAW OFFICES OF KAREN L. GOLDSTEIN**
Karen L. Goldstein (SBN 229965)
1800 Vine Street
Los Angeles, CA 90028
Telephone: 888.445.6313
Email: kgoldstein@klgcriminaldefense.com

Attorneys for Defendant
SALVADOR PLASENCIA

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 24-236-SPG-2 |
| Plaintiff, | **DEFENDANT SALVADOR PLASENCIA'S SENTENCING POSITION AND EXHIBITS IN SUPPORT;** *FILED CONCURRENTLY WITH MITIGATION VIDEO* |
| v. | |
| SALVADOR PLASENCIA, | **[REDACTED]** |
| Defendant. | **Hearing Date**: December 3, 2025<br>**Time**: 11:00am<br>**Courtroom**: 5C<br><br>**Before the Honorable Sherilyn Peace Garnett** |

TO THE HONORABLE JUDGE GARNETT AND ASSISTANT UNITED STATES
ATTORNEYS IAN YANNIELLO AND HAOXIAOSHAN CAI:

Defense counsel, Debra S. White and Karen L. Goldstein, on behalf of Salvador Plasencia, hereby submit Defendant Salvador Plasencia's Sentencing Position along with a concurrently filed mitigation video.  The position paper is based on the attached memorandum of points and authorities, all files and records in this case, the concurrently filed mitigation video, and any further information, evidence, or argument, that may be presented at the hearing

Respectfully submitted,

Dated:  November 19, 2025            */s/ Debra S. White*
                                     DEBRA S. WHITE
                                     KAREN L. GOLDSTEIN
                                     Attorneys for Salvador Plasencia

DEFENDANT PLASENCIA'S SENTENCING POSITION

1

## **TABLE OF CONTENTS**

I.   INTRODUCTION.................................................................................................1

II.   SALVADOR PLASENCIA'S HISTORY AND CHARACTERISTICS .....................4

    A.   Mr. Plasencia Grew up in Poverty With a Single Mom Who Was Not Able to
        Provide Financial or Emotional Stability ...............................................5

    B.   ██████████████████████████████████████████
        ██████████████████████████████████ ............5

    C.   Mr. Plasencia Studied Hard and Worked Tirelessly to Get A Higher
        Education and Become a Doctor, Not Allowing These Childhood Challenges
        to Define Him or Hold Him Back ...........................................................6

    D.   In Late 2022, Mr. Plasencia Opened An Urgent Care Clinic To Help
        Underserved Communities .....................................................................7

    E.   Mr. Plasencia's Former Patients Describe Him as Compassionate, Skilled,
        And Having Integrity, as Well as Someone Who Provided Attentive And
        Thorough Medical Care..........................................................................8

    F.   Mr. Plasencia Was Motivated by A Desire to Help Others, Not by Greed ..........12

    G.   Mr. Plasencia's Friends and Former Work Colleagues Also Describe His
        Altruistic Character and Selflessness ..................................................13

    H.   Mr. Plasencia's Decision to Give Up His Medical License is a Loss that Has
        Been Deeply Felt in the Local Community ...........................................15

    I. Mr. Plasencia is Profoundly Remorseful And Has Accepted Responsibility ...........16

    J. Isolated Text Messages Do Not Define Mr. Plasencia's Character ...........................17

    K.   Mr. Plasencia Has No Prior Criminal History ......................................18

    L.   Mr. Plasencia Is A Devoted Caretaker For His 2-Year-Old Son Marcus With
        Whom He Shares a Very Close Bond ..................................................18

III.  MR. PLASENCIA'S ROLE WAS DISCRETE AND LIMITED ................................19

    A.   He Treated M.P. For A 13-Day Period And Did Not Prescribe Him the
        Ketamine Which Led to His Death.......................................................19

B.     Mr. Plasencia's Lack of Experience With Ketamine Treatment Contributed to His Poor Judgement In This Case ............................................................................. 20

C.     The Off-Label Use of Ketamine For Depression Is Entirely Distinct and Different From FDA-Approved Ketamine .......................................................... 20

D.     Mr. Plasencia Was Not A Leader Or Organizer ..................................................... 22

     1.     Dr. Chavez was Mr. Plasencia's Mentor and Advisor, Not Someone He Supervised, Directed, or Had Control Over ......................................... 22

     2.     Mr. Plasencia Was Following Dr. Chavez's Direction, Driving to Him and Accommodating His Schedule .......................................................... 24

     3.     Mr. Plasencia Did not Supervise, Recruit, or Control Iwamasa Either .... 25

E.     Mr. Plasencia Has Already Suffered Severe Collateral Consequences for the Mistakes He Made: Surrendering His License, Giving Up His Clinic, And Having His Family, Safety, and Reputation Viciously Attacked in the Media .... 25

F.     Mr. Plasencia Has Shown Significant Post-Offense Rehabilitation Over The Past Two Years, Including Completing Medical Courses to Learn From His Mistakes and Volunteering at Project Angel Food ................................................ 26

IV. GOALS OF SENTENCING .......................................................................................... 28

A.     The Proposed Sentence Reflects The Seriousness of the Offense, Promotes Respect For the Law, and Provides Just Punishment Given Mr. Plasencia's Role And His Unique § 3553(a) Factors ................................................................ 28

B.     The Proposed Sentence Is More Than Adequate to Meet Goals of Specific And General Deterrence ....................................................................................... 29

     1.     Specific Deterrence ................................................................................... 29

     2.     General Deterrence: The Message Is Loud and Clear ............................. 30

C.     The Proposed Sentence Will Also Avoid Unwarranted Sentencing Disparity Because Mr. Plasencia Is Highly Distinguishable From Co-Defendants Iwamasa, Sangha, And Chavez .............................................................................. 30

     1.     Co-Defendant, Jasveen Sangha ................................................................ 31

     2.     Related Case, Defendant Mark Chavez ................................................... 32

     3.     Related Case, Defendant Kenneth Iwamasa ............................................ 34

DEFENDANT PLASENCIA'S SENTENCING POSITION

4.    Related Case, Defendant Erik Fleming ....................................................36

V.  CONCLUSION .........................................................................................37

DEFENDANT PLASENCIA'S SENTENCING POSITION

# TABLE OF AUTHORITIES

**Supreme Court**

*Pepper v. United States*, 562 U.S. 476, 477-478 (2011)........................................................28

**9th Circuit**

*United States v. Dota*, 33 F.3d 1179 (9th Cir. 1994) ....................................................24, 25

*United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010) .................................................27

**District Courts**

*United States v. Chavez*, CR 24-492-SPG………………………………………………..32

*United States v. Iwamasa*, CR 24-408-SPG………………………………………………35

*United States v. Johnson*, 588 F. Supp. 2d 997 (S.D. Iowa 2008)....................................27

*United States v. Fleming*, CR 24-417-SPG………………………………………………...35, 36

*United States v. Sangha*, CR 24-236-SPG-1……………………………………………...31

**Articles and Other Materials**

National Institute Of Justice," *Five Things About Deterrence* (Sept. 2014), Http://Www.Nij.Gov/Five-Things/Pages/Deterrence.Aspz.........................................30, n.3

Dr. Oliver Roeder, Laurne-Brooke Eisen, And Julia Bowling, Brennan Center For Justice, *What Caused The Crime Decline?* at fn.7 (2015)…………………………………………30, n.2

Valerie Wright, *Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment*, The Sentencing Project (2010)…………………………………………………30, n.2

DEFENDANT PLASENCIA'S SENTENCING POSITION

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3        Salvador Plasencia worked his whole life to become a doctor because he wanted to

4    care for other people.  He worked tirelessly to pull himself out of the poverty and the

5    neighborhood in which he grew up – a community deeply affected by gang activity and

6    violent crime.  Nothing came easy for him.  His father left when he was two years old and

7    he was raised by a mentally unstable single mother who struggled financially to provide

8    even basic needs.  She had emigrated to the United States from a small town in Mexico at

9    the age of fourteen with only an eighth-grade education and no money or family to

10   support her.  Throughout Mr. Plasencia's childhood, his mother was overwhelmed and

11   suffered from serious undiagnosed mental health issues.  She was verbally and physically

12   abusive and Mr. Placensia was neglected throughout his childhood.  He was often left to

13   be taken care of by random babysitters, strangers, or friends whose parents were willing to

14   take him in for short periods of time.  Nothing about his childhood was nurturing or

15   stable.

16       Mr. Plasencia wanted out of this life.  He realized at a very young age that the way

17   out was studying and getting a higher education.  He focused on getting good grades,

18   stayed away from gangs and crime, and he scratched and clawed his way forward.  He

19   worked hard and because of his relentless determination, he was able to get into UC

20   Riverside in 1999 and eventually UCLA medical school in 2010.  However, getting into

21   medical school was another herculean feat.  At the very end of 2022, through hard work

22   and perseverance, Mr. Plasencia opened up Malibu Canyon Urgent Care in Calabasas.  It

23   was a small, unassuming clinic in a mini-strip mall dedicated to helping members of the

24   underserved community where Mr. Plasencia offered affordable, or even no-cost, medical

25   services in both Spanish and English.  The outpouring of love and support from Mr.

26   Plasencia's former patients shows precisely the type of doctor he truly was –

27   compassionate, dedicated, knowledgeable, and giving.  (Exh. A, Letters in Support; *See*

28   *generally* Mitigation Video, Patient Interviews).

DEFENDANT PLASENCIA'S SENTENCING POSITION

Eight months after opening his clinic, M.P. contacted Mr. Plasencia to treat him for depression with ketamine while his regular doctor was away. Mr. Plasencia had no prior experience with ketamine therapy and M.P., a high-profile celebrity, was not a typical patient for Mr. Plasencia. Nevertheless, based on his own research and advice from his lifelong mentor, Dr. Chavez, who had extensive experience with administering ketamine, Mr. Plasencia believed he could responsibly navigate the treatment decisions for treating depression with ketamine for off-label use. Over thirteen days, from the end of September to the middle of October 2023, he treated M.P. without adequate knowledge of ketamine therapy and without a full understanding of his patient's addiction. It was reckless. And it was the biggest mistake of his life.

Mr. Plasencia knows that he should not have agreed to treat M.P. when he did not have sufficient knowledge or experience in ketamine therapy, particularly in the complex, largely unregulated at-home setting. He also acknowledges that he turned a blind eye to the clear signs of addiction and relapse. He did not want to see what was right in front of him. He knew M.P. as a celebrity who had undergone rehabilitation, indulged by those around him and accustomed to special accommodation, but he failed to account for the serious, ongoing addiction that went beyond mere alcohol and cigarettes.

Remorse cannot begin to capture the pain, regret and shame that Mr. Plasencia feels for the tragedy that unfolded and that he failed to prevent. True to his character, and as a clear act of accepting responsibility, he voluntarily surrendered his medical license. He gave up the very thing he clawed his way towards his entire life—his medical license, his career, his lifelong dream. In making this hard but necessary choice, he also lost his clinic, his livelihood, and his reputation. The backlash from this case has been so severe for Mr. Plasencia, that his wife and son have moved to Arizona for safety. Random strangers all over the world, who believe that he killed M.P., have explicitly threatened to kill Mr. Plasencia and his family.

Throughout his nine-year medical career, Mr. Plasencia provided exceptional care to his clients both at UCLA and at his own clinic. Mr. Plasencia's patients loved him. He was well-known as a caring, knowledgeable, and attentive physician in family and internal medicine. As one former patient, ████████ describes, for years Dr. Plasencia treated ordinary, everyday patients in need with compassion and dignity, "treat[ing] a nobody like a somebody." ████████ emphasizes that the man before the Court is not the sum of one terrible mistake, but the product of a lifetime spent showing up for people in need. (Letter from ████████, Exh. A, Bates 001-002, "…[I]n deciding who Sal Plasencia is, it matters that he was not trolling the streets looking for vulnerable strangers to hook on ketamine. He was a physician who had, for years, treated ordinary patients like me with compassion and dignity and who, when confronted with an extraordinarily powerful, addicted, and wealthy celebrity patient, allowed his judgment to be overborne.") (*Id.*)

As ████████ similarly expresses, "in a community where we are desperate for Hispanic doctors, he is representing our community and not only our community, everybody, [be]cause he does not discriminate who to see or who to treat." (Mitigation Video, ████████, 3:33-3:53). Mr. Plasencia's incredibly positive work in the community should not be overshadowed by his reckless decisions in this case.

Mr. Plasencia will live with the consequences of his poor judgement, his failure to protect, and the tragic death of M.P., for the rest of his life. He accepts the consequences of his actions and is committed to learning from them. Drawing on the resilience and grit that carried him from the financial and emotional struggles of his childhood and through medical school, he is working to become a better person and to find ways to serve others without being a licensed physician.

Today, Mr. Plasencia is volunteering with Project Angel Food where he helps prepare meals and delivers them to those in need. (Exh. B, Letter from Project Angel Food). He is taking educational courses to improve in areas where he previously struggled, and has already completed courses medical ethics and record-keeping. (Exh. E,

Certificates of Completion – Academy of Ethics and Legal Medicine).  One day, he hopes to open a non-profit organization dedicated to helping those with food insecurity.  He is also exploring other ways to use his knowledge and education to help others, including educating medical professionals, to prevent making the errors he made. (Exhibit G, Letter from Salvador Plasencia).   Mr. Plasencia is working tirelessly to improve himself personally and professionally and to rebuild the trust of those around him.  However, first and foremost, he remains focused on raising his 2-year-old, son, Marcus, and living in a way that embodies the values he hopes to instill in him: honesty, humility, compassion, and integrity.

Given the punishment Mr. Plasencia has already experienced, and will continue to experience for many years to come, a sentence of imprisonment is neither necessary nor warranted.  He has already lost his medical license, his clinic, and his career.  He has also been viciously attacked in the media and threatened by strangers to the point where his family has moved out of state for their safety.  A sentence of one day credit for time served, and three years of supervised release, would be "sufficient, but not greater than necessary" to achieve the purposes of sentencing.  18 U.S.C. §3553(a).  As such, taking into consideration the totality of the circumstances, the proposed sentence is just and appropriate and meets every goal of sentencing under 18 U.S.C. §3553(a).

## II.    SALVADOR PLASENCIA'S HISTORY AND CHARACTERISTICS

### A. Mr. Plasencia Grew up in Poverty With a Single Mom Who Was Not Able to Provide Financial or Emotional Stability

Mr. Plasencia grew up in poverty and was raised by an overwhelmed, single mother who struggled both financially and emotionally.  She had come to the United States from Mexico at age of fourteen and tried to make ends meet by working at the See's Candy store.  He never knew his father.  (PSR, p. 16 ¶86, 89).  When he was young, Mr. Plasencia was often left with a babysitter, a random stranger, or at a friend's house, because his mother was not able to take care of him.  He remembers many times there was not enough food to eat. (PSR, p. 16 ¶89).  As ███████████ the son of one of his many

1  babysitters vividly explains, "Salvador was raised by single mother who had a long

2  history trauma; cultural shame and fears of being ostracized. Salvador [had] experienced

3  very hard and difficult moments…The loss of innocence was ever present in his life.  Due

4  to his mother's limited source of income, he was raised with minimal and at times limited

5  means." (Exh. A, Bates 003-004, █████████████████)

6         For Mr. Plasencia's youngest years, he also grew up in a dangerous neighborhood

7  that was deeply affected with gangs and crime.  (PSR, p. 16  ¶92).  He remembers running

8  to and from home when he ran errands or went to school because he was scared of his

9  surroundings.  He recalls seeing people shot, stabbed, and those who had suffered drug

10  overdoses.  (*Id.*)  Although he and his mother were eventually able to move a few blocks

11  away which was a relatively "nicer" neighborhood all the other issues remained – food

12  insecurity, neglect, abandonment, and emotional and physical abuse.

13         **B.**



DEFENDANT PLASENCIA'S SENTENCING POSITION

1 ███████████████████████████████████████████████

2 ███████████████████████████████████

### C. Mr. Plasencia Studied Hard and Worked Tirelessly to Get A Higher Education and Become a Doctor, Not Allowing These Childhood Challenges to Define Him or Hold Him Back

Mr. Plasencia is a first generation Mexican-American and the first person in his family to be college-educated, let alone a medical professional.  It was a huge accomplishment when he was accepted at UC Riverside.  Although he did not have the money for college, he made it work through a series of loans, grants, and by being part of a work study program.  College wasn't just challenging on an academic level for Mr. Plasencia, it was also a serious social and cultural adjustment.  He remembers not knowing how to navigate the college world once he was accepted – what classes to take, how to figure out housing etc.  He had no role models to follow.  Instead, Mr. Plasencia would ask other students, who appeared to be well-assimilated, what classes they had signed up for, and he would emulate them.  Extraordinarily, Mr. Plasencia did not allow the difficulties of his youth to define him; instead he learned as he went, never gave up, and exercised adaptability and resilience.

Medical school was a similar and difficult journey for him, although now the stakes were even higher – he was surrounded by highly intelligent, competitive medical students, many of whom had privileged backgrounds and had been given every opportunity to succeed.  Mr. Plasencia was initially rejected from every medical school he applied to, but he refused to give up his dream.  In 2003, he was accepted into UCLA's re-application program – a one year program designed to connect unsuccessful medical school applicants with medical professionals who acted as mentors and helped the students re-apply.  In this program he met Dr. Mark Chavez who was a professional advisor to the student applicants.  Dr. Chavez became Mr. Plasencia's first, and only, mentor.  From that point on, Mr. Plasencia relied heavily on Dr. Chavez for guidance, study strategies, and support. He even shadowed Dr. Chavez at Harbor Medical Center in Torrance as a research student.

In 2004, Mr. Plasencia's hard work paid off: he was accepted into UCLA Medical School.  This was another important milestone amidst a long, hard journey fraught with obstacles.  However, medical school was exceptionally challenging.  Mr. Plasencia supported himself with loans and by working odd jobs, including tutoring and handyman work, even cleaning toilets, to make ends meet.  As one of Mr. Placensia's former patients, and close friends, ████████████ in his interview, "He scratched for that degree…. He ate rice and beans to be able to afford that. He had three jobs at night trying to clean the toilets to get that money to be able to go to that school and to come out and to be able to be a doctor."  (Mitigation Video, ████████████ addition to financial struggles, Mr. Plasencia also faced real academic challenges.  The medical boards were incredibly difficult and he did not pass all sections of the United States Medical Licensing Examination (USMLE) on his first attempt.  Yet again, through persistence, and with Dr. Chavez's mentorship, in 2017, he ultimately passed his board examinations.  Dr. Chavez remained Mr. Plasencia's mentor throughout his career until M.P.'s tragic death.

### D.  In Late 2022, Mr. Plasencia Opened An Urgent Care Clinic To Help Underserved Communities

In 2017, Mr. Plasencia held his first job as a primary care physician at UCLA. From 2017-2022, after getting a few years of solid work experience, Mr. Plasencia set his sights on a new goal – opening his own clinic.  He wanted to make quality health care affordable to everyone, including underserved communities like the one he grew up in, and he did just that.  As one of his former patients explains, "He specifically told me that he wanted to reach out to people in the community who were underserved in terms of the medical practice and that was something that was really important go him…to be able to care for children who normally could not afford a doctor.  It was something he wanted to be able to do for this community."  (Mitigation Video, ████████████, 2:56-3:16).

Mr. Plasencia tried to purchase a clinic in areas such as East LA and Beamont, where there was a large, underserved community, in addition to significant crime, but was

always outbid by others.  Eventually, an opportunity arose in a lower-income location

near Malibu Canyon, in an otherwise affluent community in Calabasas, where he could

build his own place from the ground up.  This had been a dream of Mr. Plasencia's since

he was a child.

In December of 2022, Mr. Plasencia opened up his urgent care clinic: Malibu

Canyon Urgent Care.  This was during the end of COVID.  In the prior years leading up to

the opening of his clinic, when COVID was at its peak, Mr. Plasencia provided care for

those in need by traveling to the patient's houses and also helping patients using

telehealth.  By the time he was able to open his clinic, he had already developed a

reputation in the local Hispanic community for helping patients who might not otherwise

be able to afford good health care and doing do with kindness and compassion.

### E. Mr. Plasencia's Former Patients Describe Him as Compassionate, Skilled, And Having Integrity, as Well as Someone Who Provided Attentive And Thorough Medical Care

Mr. Plasencia was truly loved by his clients.  He was known for providing

excellent and compassionate medical care that far exceeded what is typical or expected in

modern medical practice.  The letters of his former patients reveal a doctor who viewed

medicine as a service to be provided to help others, not a business, and whose professional

abilities and empathy transformed the lives of those he treated.

████████████████████, a mother of a 7-year-old daughter, writes, "Dr. Plasencia

exemplifies the highest ideals, of his profession. He is not only a healer but also a deeply

empathetic human being whose presence uplifts those around his. His service to our

community is irreplaceable." (Exh. A, Bates 005-006,████████████████████).  She

further states "[she is] aware of the charges before him. Based on my personal experience,

I can say this conduct is surprising and not reflective of the character I have come to

know."  (*Id*.)

████████████████ expresses similar sentiments about Mr. Plasencia's empathy and

ethics, "His passion for medicine and for helping others was evident in every interaction.

Opening his own practice was clearly a dream fulfilled, and it was a joy to witness

DEFENDANT PLASENCIA'S SENTENCING POSITION

someone with such a pure heart living out his purpose….In my years of knowing Dr. P, I have only ever observed a kind soul; someone who carries himself with humility and sincerity.  He is the kind of person who makes others feel safe, respected, and heard." (Exh. A, Bates 007-008, ███████████████).

███████████████ explains,  "…It became clear to me that…[Dr. Plasencia]… approaches his work not simply as a job, but as a calling. I have seen the dedication he puts into his practice, his patience with every question, and the way he reassures patients during moments of anxiety. It is rare to find a doctor who combines such skill and knowledge with warmth and understanding."  (Exh. A, Bates 009, ███████████████ ███████).

███████████████ shares, "[Dr. Plasencia] saved my husband's life." (Exh. A, Bates 010-011, ███████████████).  She adds that, "from day one of meeting Dr. Plasencia, it was very clear that he cared and would be a doctor that could be counted on, which for this day and age can feel rare. Seeing most doctors feels like you're just a number… That has never been our experience with Dr. Plasencia."  (*Id*.)

███████████████, a Calabasas resident, describes her relief in finding a doctor who truly listened: "Each and every experience I have had with him has been uplifting, positive, thorough, and completely professional. It is refreshing to have a doctor who listens to you, asks questions, looks you in the eye, orders tests, and is always there for you.…This is a good man, and an outstanding doctor."  (Exh. A, Bates 011, ███████████ ███████████).

███████████████ writes that when she was homebound and unable to drive during COVID, "Dr. Plasencia volunteered to come to my home to give me the test, which he did. That was so kind of him and I was so pleased that he would help me out like that. I have never had a doctor in the past ever consider a home visit."  (Exh. A, Bates 012, ███████████████).

9

DEFENDANT PLASENCIA'S SENTENCING POSITION

██████████ was first treated by Mr. Plasencia during the height of the pandemic - he became her family's concierge doctor. (Exh. A, Bates 013-█████████████ ██████ She writes, "Dr. Placencia's medical insight and commitment have made a profound difference in our lives and those around us….Beyond his professional excellence, Dr, Plasencia is a man of integrity, compassion, and humility. He treats every patient as if they were his own family. I know firsthand that he has dedicated his life to helping others, often putting his patients' well-being before his own." (*Id*.)

██████████ remembers a crucial treatment decision which Mr. Plasencia made which helped her son recover from chronic pain. "For months,███ had been suffering constant illness, and it was Dr. Plasencia's attentiveness and advocacy that led to the correct diagnosis and treatment. Thanks to him, ███ finally regained his health, and our family's daily life improved tremendously." (Exh. A, Bates 015, ████████████ ██████

██████████ explains how her son was one of Dr. Plasencia's first newborn patients and that he treated them like family, "Dr. Placencia treated my son from the time he was born. I believe he was Dr. Placencia first newborn when Dr. Placencia was at UCLA and Dr. Placencia just treated us like family. I was a very nervous mom as all first time moms are, and he always alleviated my fears. He's always treated us like family." (Mitigation Video,█████████, 1:24-1:47).

██████████ similarly observes that "each time we've required Dr. Plasencia's services, he's been consistently available, even outside regular office hours.… He's demonstrated exceptional professionalism, empathy, and diagnostic skill.  Notably, he never charged us extra for after-hours care, which we found remarkable. (Exh. A, Bates 016,█████████████

Similarly, █████████ echoes Luana's sentiment about Mr. Plasencia's ethics and professional caution: "He is thoughtful and cautious in his approach, prescribing

1   antibiotics only when truly necessary and consistently following up to make sure his

2   patients are recovering well." (Exh. A. Bates 017, ██████████████████

3            ██████████████ similarly expresses deep gratitude for the lifesaving care which

4   Mr. Plasencia provided, "A particularly memorable moment that underscores his expertise

5   occurred during a life-threatening situation I faced… Dr. Salvador acted swiftly… His

6   prompt response undoubtedly saved my life." (Exh, A, Bates 018,██████████████

7   ████████She also writes: "His humility, kindness, and professionalism are truly

8   inspiring." (*Id.*)

9            ██████████████ also discusses Mr. Plasencia's skill and care as a doctor stating,

10  "Dr. P struck me not just as a highly knowledgeable doctor, but as someone who

11  genuinely wants to help people. He remembered details about our lives, followed up with

12  care, and clearly took pride in creating a practice that served the community with

13  excellence and heart…. He had a natural way of making █████…[our son]…feel

14  comfortable and safe, even during visits that would typically make a child nervous. That

15  kind of patience and warmth isn't something you can fake; it's part of who he is.  It made

16  us feel like our child was in excellent hands, and that trust is something I never took for

17  granted." (Exh. A, Bates 019-021,██████████████████

18      Likewise, ██████████ explains in his interview how Mr. Plasencia saved his life.

19  In██████████ case, Mr. Plasencia identified symptoms that other doctors had missed –

20  nystagmus in his eyes - which ultimately led to the discovery that he had a massive brain

21  tumor.  Mr. Plasencia literally saved Paul's life.  (Mitigation Video, ██████████, 1:03-

22  1:23).

23      ██████████████, explains how much Mr. Plasencia helped him throughout difficult

24  times, not just by providing good medical care but also by being compassionate and a

25  good listener.  "I have known [Dr. P] as a physician in my community ever since I moved

26  to the area. I first met him when I sought care at the urgent care across from where I lived,

27  during one of the most challenging periods of my life. At that time, I was enduring

28

11

DEFENDANT PLASENCIA'S SENTENCING POSITION

tremendous difficulties—raising my daughter as a single mother, going through a painful and abusive court case, struggling with financial burdens…Dr. Salvador Plasencia provided far more than medical treatment; he became a steady source of compassion and reassurance. His ability to listen, to guide, and to care with such sincerity made me feel truly seen and supported when I felt utterly alone."  (Exh. A, Bates 005-006).

### F.  Mr. Plasencia Was Motivated by A Desire to Help Others, Not by Greed

There is also a common theme in many of Mr. Plasencia's former patient testimonials about his genuine, and non-financial, motivations for treating patients.  Mr. Plasencia truly wanted to help people.  He was driven to provide good patient care and often treated patients at low-cost, or no cost.  It is the heartfelt words of his former patients which show why the government's narrative about a doctor motivated by greed is unfair and inaccurate.

███████████ describes how Mr. Plasencia opened his clinic with the intention of helping those who needed it most, "Salvador aimed to create a space that would meet the needs of all his patients and invested significant time and money in building his practice. Many of his patients followed him to his new location because he was reliable and knowledgeable, leading to the continued growth of his practice. He consistently expressed his desire to help as many people as possible and to give back to his community." (Exh. A, Bates 022-23, ██████████████).

As ██████████ states in her interview, "Actually I never pay him for the services.  I never pay him like nothing. He only help me because he understand I'm new here and I need help." (Mitigation Video, 3:54-4:05).

███████████ similarly describes how Mr. Plasencia, "always made us feel deeply cared for and supported; never rushed, never transactional. He has never prioritized payment or convenience; his only focus has been helping his patients heal and stay well." (Exh. A, Bates 015).

DEFENDANT PLASENCIA'S SENTENCING POSITION

█████████ emphasizes that in his 61 years writes that he had never met a doctor like Dr. Plasencia: "I've never in my life had a doctor that would give me his personal cell phone… He often answered my questions and gave me advice, without even charging me or billing my insurance." (Exh. A, Bates 024, █████████).

█████████ explains that, *"Dr. Plasencia was different from the rest. He listened, he showed compassion, he cared.… Over the eight years of being in his care, I witnessed a compassionate young doctor trying to bring affordable care options to California."* (Exh. A, Bates 025-26, █████████).

█████████, "Dr. Plasencia took me in, stitched my wound, and refused to charge me for the service. I felt bad because his office had just opened, yet he was still so generous.  When I tried to offer him money to cover the expenses, he simply said, "Don't worry about it, as long as you're fine." (Exh. A, Bates 27-28, █████████).

█████████ writes about Mr. Plasencia's genuine care and his commitment to helping those in need: "….Not only did he treat me, he also treated my friends who could not afford medical expenses. He visits people who have no transportation and no means. I have never met a Dr who is so professional, yet so giving of himself to those in need." (Exh. A, Bates 029,█████████).

█████████ emphasizes Mr. Plasencia's dedication to helping others, "During Covid, while I was in the trenches of running my business during a pandemic, Sal made himself available to me, my family and my employees…He was never concerned with monetary gain and didn't even want to discuss payment.  His focus has always been to help first, worry about the rest later.   Over the years, he has shown compassion, empathy and a desire to serve.  Not because that is what is expected of a doctor but because that is who Sal is to his core.  He values people, family, and relationships.  Sal has always been one to see the bigger picture of one day putting back into the community who made him the person he is today."  (Exh. A, Bates 003-004).

### G. Mr. Plasencia's Friends and Former Work Colleagues Also Describe His Altruistic Character and Selflessness

It is not just Mr. Plasencia's former patients who strongly support him and describe his altruistic and compassion character but also his family, and former work colleagues, who portray him as a kind, generous, and ethical doctor whom they love and respect.

████████████, a lifelong friend of thirty-seven years, describes Mr. Plasencia's determination, compassion, and heart. He writes, "My earliest memories of Sal have always been that he is always thinking about others and never doing anything for recognition or personal gain….Over the years, he has shown compassion, empathy, and a desire to serve. Not because that is what is expected of a doctor, but because that is who Sal is at his core." (Exh. A, Bates 030-031, ████████████████). ████████ also gives an example from Mr. Plasencia's youth which really embodies the grit and perseverance he has shown throughout his life.

████████ writes, "Sal always had a love for basketball, and in high school he wanted to be part of the team even though people told him he didn't have the talent. He never let that discourage him and to my surprise, he made the Varsity team. While others were walking around with Varsity jackets, Sal never had one because he knew that would be money taken away from his family." (*Id.*) He further adds, "During COVID, Sal made himself available to me, my family, and my employees for rapid testing, treatments, and visits.… His focus has always been to help first, worry about the rest later." (*Id.*)

████████████, Mr. Plasencia's mother-in-law, explains, "as a physician, Salvador has consistently shown a deep commitment to the well-being of his patients.… In his personal life he is a good husband and great uncle always dedicating time to connect with his family. Salvador approaches life with humility and sincerity." (Exh. A, Bates 032, ████████████).

████████████ similarly writes: "He has been an extraordinary support not only to me personally but also to my family and to the staff in our organization.… He stood out for his humility, sincerity, and integrity." (Exh. A, Bates 033, Letter from ████████████).

███████████ aptly summarizes the sentiment felt by many of those close to Mr. Plasencia: "He stood out as an exceptional doctor who truly cared about his patients on a personal level." (Exh. A, Bates 034, ███████████████). "The situation he is now facing came as a complete shock to me and my family, as it is entirely out of character from the man we've known and respected for years." (*Id*.)

███████████ who has known Mr. Plasencia for fifteen years as both a patient and a work colleague, writes: "He is deeply compassionate, attentive, and community-oriented.… He often went above and beyond for his patients, making himself available and showing the kind of dedication you rarely see in urgent-care settings...His passion for medicine and for helping others was evident in every interaction." (Exh. A, Bates 007-008).

███████████, who considers himself like an uncle to Mr. Plasencia, and who works as a Catholic chaplain, writes, "Chava in his years as a practicing physician has lived up to his dreams of helping those in need and providing medical care to the less fortunate.… He repeatedly stated that whenever he treats a patient whose limited resources remind him of his humble beginnings*."* (Exh. A, Bates 003-004).

Together, these voices show Mr. Plasencia's true character and who he is at his core: a man defined by compassion, generosity, humility, and a genuine dedication to helping others—not a man driven by greed.

### H. Mr. Plasencia's Decision to Give Up His Medical License is a Loss that Has Been Deeply Felt in the Local Community

On September 18, 2025, Mr. Plasencia voluntarily gave up his license to practice medicine because he knew it was the right thing to do. Patients uniformly describe how Mr. Plasencia no longer practicing medicine is a loss in their lives and one felt in the community. ███████████ explains, "It is a real loss to the community of having such a good doctor who cares, who is responsive, who wants to help, he truly wants to help people." (Mitigation Video, ███████████, 7:55-8:07)

15

1    ███████████████ writes, "even one day of him not practicing medicine

2    would affect countless individuals who rely on his skill, kindness, and dedication." (Exh.

3    005-006).

4    ███████████████ this thought, "losing him as our primary care physician has

5    shaken us up and left a community of people without an extremely caring and impactful

6    doctor." (Exh. A, Bates 010).

7    ███████████ similarly explains, "Dr. Plasencia is truly missed, and the fact that

8    he is not able to do what he loves and does best is such a loss to the community. This is a

9    good man, and an outstanding doctor." (Exh. A, Bates 011).

10   As ███████████ concludes, "I hope that you will take into consideration his

11   kindness and all the good he has done. He is a great loss to our community." (Exh. A,

12   Bates 012).

13   The community's words make clear that Mr. Plasencia's compassion and care as a

14   doctor have left a mark that cannot be replaced and that in relinquishing his license, he has

15   truly left a void for those who need him.

### I.   Mr. Plasencia is Profoundly Remorseful And Has Accepted Responsibility

17   Mr. Plasencia has fully accepted responsibility for his actions, "I cannot measure

18   the pain this has caused Mr. Perry's family and friends. I cannot begin to express how

19   sorry I am for the role I played in this tragedy. No explanation or expression of regret can

20   undo that loss. What I can do is accept full responsibility and commit myself to ensuring

21   that this will never happen again."  (Exh. G).  This is why he accepted a plea bargain

22   where he admitted to four serious felonies and entered a guilty plea before this Court on

23   July 23, 2025.  It is also why he voluntarily gave up his license to practice medicine on

24   September 18, 2025.  There can be no greater sign of acceptance than that.

25   Additionally, Mr. Plasencia has repeatedly expressed his sincere remorse to

26   friends, family, and former patients, about the grave mistakes he made and how a day

27   doesn't go by without regretting his failure to heal M.P, "…hundreds of people helped me

28

16

DEFENDANT PLASENCIA'S SENTENCING POSITION

1    get here and I let them down with mistakes that I made and it's very sad for me to

2    surrender my license and acknowledge that I let them down. I let myself down. I let Mr.

3    Perry down and the future patients that I hope to heal, I hope to heal.  I feel like I let them

4    down too."  (Mitigation Video, Salvador Plasencia, 0:08:-1:02).

5              **J.  Isolated Text Messages Do Not Define Mr. Plasencia's Character**

6              Mr. Plasencia fully accepts responsibility for his actions in this case, including the

7    insensitive communications he made during his treatment of M.P.; however, the text

8    messages which have been the focal point of media scrutiny do not fairly or accurately

9    represent Mr. Plasencia's character as a doctor or an individual.

10            Mr. Plasencia looks back and is ashamed of some of the messages he wrote.  He

11   should never have used the word "moron" to refer to anyone, certainly not a patient.  His

12   tone and word choice was incredibly unprofessional and disparaging.  Mr. Plasencia

13   responded without thinking, after M.P. had told him over the phone that he could make

14   "mucho money" if Mr. Plasencia helped him.  It was upsetting to him as a Mexican-

15   American doctor.  He reacted impulsively and without reflection.  The context explains

16   his reaction; it does not excuse it.

17            Again, Mr. Plasencia takes ownership for his conduct, including these

18   unprofessional and insensitive messages with Dr. Chavez.  However, isolated text

19   messages which have been emphasized in the media, and by the government, do not begin

20   to tell the whole story and do not fairly represent Mr. Plasencia's character.  Rather, the

21   words of Mr. Plasencia's former patients more accurately and honestly demonstrate who

22   Mr. Plasencia has always been as a doctor, and a person, contrary to the excerpts from

23   isolated text messages.  As aptly stated by ████████████, "What's in the media, and

24   what's in the court of public opinion, is not the Doctor Plasencia that I know.  It's not the

25   Doctor Plasencia who took such excellent care of my son and always went above and

26   beyond to make sure he was receiving the best care he possibly could."  (Mitigation

27   Video, ████████████, 7:06-7:24).

28

17

1

**K. Mr. Plasencia Has No Prior Criminal History**

2

Mr. Plasencia has no prior criminal history.  He is a true first-time, "zero-point

3

offender" with zero criminal history points in Criminal History Category I.  As such, he is

4

statistically unlikely to commit future crimes.  It is well-known that empirical studies

5

show that defendants with zero criminal history points, like Mr. Plasencia, have

6

significantly lower recidivism rates.  As such, Mr. Plasencia's complete lack of any prior

7

criminal history is another factor in support of the requested non-custodial sentence.  It

8

again shows that Mr. Plasencia's conduct in this case was truly aberrational and is

9

unlikely to ever re-occur.

10

**L. Mr. Plasencia Is A Devoted Caretaker For His 2-Year-Old Son Marcus
With Whom He Shares a Very Close Bond**

11

12

Today, Mr. Plasencia is focused on raising his 2-year-old son, Marcus.  (Mitigation

13

Video, Salvador Plasencia, 8:54).  Mr. Plasencia is one of Marcus' primary caretakers and

drives to Arizona every single weekend to spend time with him.  (PSR, p17 ¶97).  Mr.

14

Plasencia was raised without a father and without a nurturing stable parent in his life.  He

15

wants to make sure that Marcus does not have to do the same and is determined to be an

16

attentive, involved, and doting father.  As Mr. Plasencia expresses in the video, "I grew up

17

without a father I was so busy trying to be a doctor my whole adult life that I didn't realize

18

that the thing that I really wanted to be was a father so when my son was born I felt like

19

the most important job of mine had started …and I want him to know that everything I'm

20

doing now is for him, because I know how important it is to have a father in your life, and

21

I want to be that. I want to be there for him.  (Mitigation Video, Salvador Plasencia, 8:25-

22

9:22).

23

At 2-years-old, Marcus is at an impressionable age, one where he needs the loving

24

influence and support of both parents in his life to enable him to thrive and succeed.  Mr.

25

Plasencia shares a deep and loving bond with his son and is determined to be the father he

26

never had.  He hopes the Court will give him the opportunity to remain in the community

27

28

18

so that this bond is not broken and his son is not made to suffer for the mistakes that he made.

## III.    MR. PLASENCIA'S ROLE WAS DISCRETE AND LIMITED

### A.  He Treated M.P. For A 13-Day Period And Did Not Prescribe Him the Ketamine Which Led to His Death

Mr. Plasencia treated M.P. over the course of just 13 days and had not treated him for more than two weeks before his death.  Undoubtedly, Mr. Plasencia made a series of bad decisions when he treated M.P., but nevertheless he played a more limited and discrete role here and did not prescribe the ketamine to M.P. which he overdosed from.

Mr. Plasencia now understands that he should not have treated M.P. in the first place and should not have left any vials of ketamine with M.P.  For doctors who are experienced with using ketamine to treat depression, or for companies such as Mindbloom, leaving medication with a trusted person for administration may be acceptable, and even common.  (*See* Mitigation Video, Dr. Wender, 5:59 – 6:14).

Mr. Plasencia should not have rushed to treat M.P. and in doing he used poor judgement and made bad decisions.  For example, M.P. first contacted Mr. Plasencia on September 30th and wanted immediate treatment that night.  Mr. Plasencia should have taken a step back and taken more time to carefully evaluate M.P.'s entire situation rather than to rush to his home in the late night hours for the first treatment.  What followed in the next 12 days was a serious lapse of judgement compounded by one mistake after another.  He should not have refilled the prescriptions so quickly, or agreed to meet M.P. and his assistant at different locations outside of M.P.'s house under artificial time constraints.  He should not have left the medication for self-administration.

Mr. Plasencia now sees the gravity of these poor decisions and has fully accepted the serious consequences of these acts.  At the same time, it remains important and mitigating that his own conduct reflected a specific, limited role in the offense conduct and did not directly cause M.P.'s death.

### B. Mr. Plasencia's Lack of Experience With Ketamine Treatment Contributed to His Poor Judgement In This Case

Mr. Plasencia had no prior experience prescribing or administering ketamine before he treated M.P. His medical practice had been rooted in family and urgent care medicine. He was entirely unfamiliar with the treatment's off-label use for depression. As such, when he was first approached by M.P. about ketamine treatment for depression, he relied on his own cursory research and also relied in good faith on the representations and guidance of his former longtime mentor, Dr. Chavez, who had owned and operated a ketamine clinic and had specialized expertise in the field.

### C. The Off-Label Use of Ketamine For Depression Is Entirely Distinct and Different From FDA-Approved Ketamine

The off-label use of ketamine, for conditions such as depression, is a confusing and unregulated space without clear federal oversite and inconsistent professional standards. It is entirely distinct and different from the FDA-approved use of ketamine as an anesthetic. The difference between the two is essential to understanding the nature of the offense. When M.P. reached out to Mr. Plasencia, he was seeking treatment for his depression with ketamine. The ketamine used for this type of mood disorder—referred to as off-label ketamine—is used differently from FDA-approved ketamine, which is used for anesthesia.

Dr. Wender, an anesthesiologist for 20 years and the founder and CEO of the Bay Area Ketamine Clinic (2015 to present), describes the marked differences between the FDA-approved use, and the off-label use, of ketamine and their different protocols. (*See generally*, Mitigation Video, Dr. Wender, 4:26-6:46; Exh. H, Resume of Dr. Wender). The manner in which the off-label use of ketamine is typically administered, is entirely different than the FDA-approved use of ketamine which is used as an anesthesia and therefore has highly specific and stringent protocols. Dr. Wender, who has given around 7,000 ketamine infusions in his career, explains, "…[T]he FDA approved use for ketamine is general anesthesia and anesthesia sedation. That requires a trained certified anesthesiologist because you're going to render someone unconscious, someone who's

20

going to do surgery of some type and you gotta take over the blood pressure and breathing

for the patient… When you give it off-label in the office or at home, it's completely

different. The amount you're giving the patient is number one, lower. Number two, it's

given over a much longer period of time, and when we induce anesthesia, it'll all be given

over basically 10 seconds… when we give it for off-label use, it's a slow infusion where

it's given an IM and a muscle, and it comes out slower – so the dose is over a 30 to 40

minute period." (Mitigation Video, Dr. Wender, 4:42-5:28).

Dr. Wender, further explains how when used off-label for depression, ketamine is

widely regarded as safe and effective.  "…it's been shown to be safe to use as an off-label

manner." (Mitigation Video, Dr. Wender, 5:41-5:45).  He also expresses how life-

changing and effective the treatment is for those suffering from resistant depression,

"…it's extremely effective in treatment-resistant depression." We can get people out of

severe life-threatening depression and suicide. "  (Mitigation Video, Dr. Wender, 6:21-

6:26).

Dr. Wender additionally gives context as to how ketamine is typically administered

for off-label use, "…the majority of it's actually given at a home without any medical

supervision whatsoever." He explains that it is routinely administered in a lot of different

places, "People have had this in a lot of different places. They've had it in the doctor's

office, they've had it in yoga mats in Berkeley with no monitoring, they've had it in the

jungle in Peru, they've had it in their living room, they've had it in their backyard. Getting

one of these treatments, there's not a specified place it does not have to be in a doctor's

office." (Mitigation Video, Dr. Wender, 5:47-5:52; 6:28-6:46).

Dr .Wender then describes how ketamine for off-label use may be prescribed to be

administered at home, or even outside the home, by a loved one, and/or someone who is

not medically trained.  This is a common and acceptable medical practice.  "Off-label it's

been given by multiple different people.  You have ER doctors giving it, you have nurse

practitioners, you have family practitioner, nurse practitioners who have formed their own

ketamine clinic, and it's been shown to be safe to use as an off-label manner….(Mitigation Video, Dr. Wender, 5:29-5:44).

The off-label use of ketamine is not only confusing, and highly unregulated, but was also completely unfamiliar to Mr. Plasencia.  To add to this complexity, M.P. was not a typical patient receiving off-label ketamine treatment.  His long history of addiction required heightened caution and closer supervision than a typical, or common, patient.

Prior to treating M.P. with ketamine, Mr. Plasencia reviewed some of the available literature for off-label use, and also asked Dr. Chavez for treatment advice; however, the information he obtained was wholly inadequate.  He now recognizes that he should not have agreed to treat M.P. when he was asked on September 30, 2023.  He acknowledges that he acted recklessly in his treatment decisions and should have exercised far greater diligence when treating M.P.

Mr. Plasencia further recognizes that he allowed himself to be influenced by the unique and unfamiliar pressures of treating a high-profile patient and that he also seized on an opportunity to earn money for his struggling clinic.  Unquestionably, Mr. Plasencia's inexperience combined with his decision to follow Mr. Chavez's advice while ignoring clear signs of M.P.'s addiction contributed to the mistakes that occurred over the 12 days of treatment that followed.

### D.  Mr. Plasencia Was Not A Leader Or Organizer

#### 1.  Dr. Chavez was Mr. Plasencia's Mentor and Advisor, Not Someone He Supervised, Directed, or Had Control Over

When Mr. Plasencia was contacted by Victim M.P., he immediately reached out to Dr. Chavez.  Mr. Plasencia did not have any background or experience in ketamine treatment and Dr. Chavez was his lifelong mentor who had previously run a ketamine clinic.  As Dr. Chavez told investigators, and the government, he had acted as a professional mentor to Mr. Plasencia for the last twenty years and he "knew" that Mr. Plasencia "had little, if any, experience treating patients with ketamine."  (*United States v. Chavez*, Case No. 24-492-SPG, Dkt. 3, 11:14-15).

In response to Mr. Plasencia's request for help, Dr. Chavez offered his advice, sold him ketamine vials and lozenges, as well as gloves and syringes, and profited from his involvement.  For example, on September 30, 2023, immediately after speaking with M.P. for the first time, Mr. Plasencia reached out to Dr. Chavez,

> Plasencia:    Hey Mark, can you call me when you have a second?
>
> I have a patient who has questions about ketamine treatment. I want to help this person get the medication they need but I just want to make sure I'm not doing anything but would be outside the normal scope of care for psychiatric condition" (Exh. C, Bates 147, texts from 9/30/23)

In the above text message, Mr. Plasencia is seeking Dr. Chavez's advice, as he had done for more than 20 years.

Similarly, after Mr. Plasencia's first treatment session with M.P., where he declines to provide the specific dosage M.P. requested (60 mg every 20 minutes x 4), Mr. Plasencia texted Dr. Chavez for advice, "[M.P] said another doctor did this for him but i think that guy was out of town…Would that regimen have been safe?" and Dr. Chavez replies, "Yes."  (Exh. C, Bates 156-157, texts from 10/1/23).

Mr. Plasencia continued to seek advice from Dr. Chavez throughout his treatment of M.P.  On October 1, 2023, Mr. Plasencia texted,

> Plasencia:    What is the maximum you can give a person in a day
> Chavez:        There is no maximum.
> Plasencia:    What??? There has to be a maximum
> Chavez:        Depends what you are using it for…Nope…It gets metabolized very quickly        (Exh. C, Bates 158-159)

On October 2, 2025, Dr. Chavez then directed Mr. Plasencia to sell ketamine lozenges to M.P. stating, "You should sell him the troches as well" (Exh. C, Bates 170, text from 10/2/23).  On this same date, Mr. Plasencia asks Dr. Chavez for further advice on how to prescribe the lozenges, "These troches are twice weekly, right?"  (*Id.* at 175). Dr. Chavez was guiding and directing Mr. Plasencia throughout the course of the ketamine treatment, not the reverse.

23

### 2. Mr. Plasencia Was Following Dr. Chavez's Direction, Driving to Him and Accommodating His Schedule

Mr. Plasencia followed Dr. Chavez's direction throughout M.P.'s treatment.  For example, he repeatedly drove to Dr. Chavez to pick up the prescriptions from Dr. Chavez, not the reverse.  On October 4, 2023, Mr. Plasencia drove over 1½ hours to where Mr. Chavez was located to pick up ketamine and supplies.  (Exh. C, Bates 191-2, text from 10/4/23).  Again, on October 10, 2023, Mr. Plasencia drove a little over an hour to meet with Dr. Chavez for the same purpose.  (Exh. C, Bates 203-4, texts from 10/10/23.)  There was one occasion where Mr. Plasencia asked to meet halfway but offered financial compensation to Dr. Chavez for the additional travel time.  This shows the power dynamic between Mr. Plasencia and Dr Chavez.  Mr. Plasencia was not directing, controlling or leading, Dr. Chavez.  He was merely buying supplies and taking advice that Dr. Chavez offered.

Again, this is not to say that Mr. Plasencia does not accept full responsibility for his own actions.  He does.  However, the degree to which Dr. Chavez influenced his treatment decisions shows that Mr. Plasencia did not supervise him, direct him, or have control over him. To the contrary, it was Dr. Chavez, an experienced ketamine provider with his own DEA registration and a history of operating a ketamine clinic, who instructed, advised, and supplied Mr. Plasencia.[1]  Dr. Chavez was not a subordinate.  He was operating independently, with the same supervisory and authoritative role that he had held over Mr. Plasencia since he mentored him in college, and with far more knowledge and experience in the ketamine field than Mr. Plasencia had.

This imbalance in roles, decision-making, and clinical experience, explains why the aggravating role enhancement under § 3B1.1 should not apply.  Rather, it supports a downward adjustment under § 3B1.2 for mitigating role as previously argued in defense counsel's objections to the presentence report.  (Dkt. 91).  Mr. Plasencia's role was

---

[1] Furthermore, at the time Plasencia contacted him, Dr. Chavez had already engaged in prescription fraud, including using a fictitious patient name to obtain ketamine lozenges from a pharmacy.  (Exh. D, DEA Report of Investigation and Attachments, Bates 35461-35475).

DEFENDANT PLASENCIA'S SENTENCING POSITION

limited in scope, duration, and discretion. He did not recruit or direct Dr. Chavez, nor did he control the conduct of others.

As the Ninth Circuit explained in *United States v. Dota*, 33 F.3d 1179, 1189 (9th Cir. 1994) the § 3B1.1 enhancement may apply where a defendant recruits another person but *also* supervises or controls that participant. Recruitment alone is not enough. There has to be evidence of authority, direction, or planning which we do not have here.

### 3. Mr. Plasencia Did not Supervise, Recruit, or Control Iwamasa Either

The very same rationale applies to Iwamasa. Mr. Plasencia did not supervise, recruit, or control him. Iwamasa independently obtained ketamine from street dealers, administered it to M.P. 6-8 times per day without supervision, and injected the fatal does which led to M.P's death. These actions he took entirely on his own and without direction, consultation, or supervision from Mr. Plasencia. Iwamasa also directed and orchestrated the dates, times, and locations where M.P. was treated, not the reverse. Clearly, Mr. Plasencia should have exercised more direction and control over the location and timing of the treatment of his own patient, but he did not. Further, after M.P.'s death, Iwamasa deleted communications implicating himself in the death and hired someone else to destroy evidence. Iwamasa was the one who exercised control, made decisions, and escalated the risk. Mr. Plasencia played a discrete and limited role and was not a leader or organizer in this tragic sequence of events.

As the Ninth Circuit has emphasized, leadership requires control. There must be evidence that the defendant "exercised some degree of control or organizational authority over others." *United States v. Dota*, 33 F.3d 1179, 1189 (9th Cir. 1994). Quite simply, Mr. Plasencia never had that control over Dr. Chavez, Iwamasa, or anyone else.

### E. Mr. Plasencia Has Already Suffered Severe Collateral Consequences for the Mistakes He Made: Surrendering His License, Giving Up His Clinic, And Having His Family, Safety, and Reputation Viciously Attacked in the Media

Unquestionably, Mr. Plasencia has made serious, irreversible mistakes but he has also already suffered severe and permanent collateral consequences. He has lost

25

everything he worked so tirelessly to create: his license, his clinic, his career dream. He will likely never practice medicine as a doctor again and this truly is the ultimate punishment. Further, since his arrest Mr. Plasencia has received numerous death threats to him and his family by telephone and by text message. This is why his wife and son have moved to another state. (*See e.g.,* Exh. F, Sample of Threatening Communications). And in combination with these consequences, there has been a media frenzy which has demonized and painted Mr. Plasencia as someone he is not – a killer. As one of Mr. Plasencia's former patients best explains, "What's in the media and what's in the court of public opinion is not the Dr. Placencia that I know. It's not the Dr. Placencia who took such excellent care of my son and always went above and beyond to make sure he was receiving the best care he possibly could." (Mitigation Video, ██████████, 7:06-7:23). Unfortunately, no matter how many friends, former patients, and colleagues speak up to support Mr. Plasencia, the damage has already been done. Mr. Plasencia's career, reputation, and even the safety of his family, has been permanently and irrevocably compromised.

All of the above shows the different ways in which Mr. Plasencia has already been punished for his mistakes in this case and will continue to be punished for years to come. This is also a strong reason mitigating in favor of a non-custodial sentence: an additional term of imprisonment is simply not needed to achieve any of the goals of sentencing, including punishment.

### F.  Mr. Plasencia Has Shown Significant Post-Offense Rehabilitation Over The Past Two Years, Including Completing Medical Courses to Learn From His Mistakes and Volunteering at Project Angel Food

Over the past two years since the offense conduct, Mr. Plasencia has also demonstrated significant post-offense rehabilitation. He has successfully been out on bond under pretrial supervision with no missteps for over one year. Mr. Plasencia has shown the Court exactly what can be expected of him if he is given the opportunity to remain out in the community—strict compliance with all of the Court's orders and

someone who will make meaningful contributions to the local community and his family.
Further, he is already making the most of his time, enrolling in and completing medical
courses to learn from his mistakes in this case and volunteering after he gave up his
license to practice medicine.

In terms of classes, on March 12, 2025, he enrolled and completed a Medical
Ethics and Professionalism course. (Exh. E). On September 6, 2025, he then also
completed a 6-month post-course follow-up. (*Id.*) On May 4, 2025, he completed a two-
day Medical Record Keeping course. (*Id.*) As is evident by the title of these courses, Mr.
Plasencia has chosen to learn from his mistakes and to work to hone the skillsets he lacks
which contributed to his poor judgment in this case.

Mr. Placencia has also started volunteering at Project Angel Food, a non-profit
organization in Los Angeles County which provides free meals for people too sick to shop
and cook for themselves. He first volunteered by providing transportation. However,
after surrendering his license, Mr. Plasencia has dedicated more of his time to the
organization and has expanded his role there. He now also works in the kitchen and finds
the work meaningful and fulfilling. (Exh. B, Letter from Project Angel Food).

Notably, more than two years has passed since the offense conduct. Mr. Plasencia
has shown the Court that he can be successfully supervised out in the community and is
not at risk to recidivate. The Ninth Circuit has specifically recognized the importance of
good behavior when a significant period of time has passed since the offense conduct. It
has even cited to this factor as part of its justification for imposing a probationary
sentence: "[L]ook[ing] at the record with [Edwards] . . . I'm satisfied that somebody who
committed these offenses . . . roughly nine years ago, and has lived the life that he has
lived in the interim despite all the things that have gone on, I don't think there's a very
good likelihood that he would engage in this kind of business in the future . . . ." *United
States v. Edwards*, 595 F.3d 1004, 1011 (9th Cir. 2010). .

Other District Courts have also held that significant weight should be afforded to defendants who have successfully served a period of pretrial supervision and where a significant period of time has passed between the offense conduct and sentencing, like in Mr. Plasencia's case,  "The Court views Defendant's behavior during the three-year period between the seizure of his computer and his indictment as a good indication of what society can expect from him after he completes his sentence." *United States v. Johnson*, 588 F. Supp. 2d 997 (S.D. Iowa 2008).  Just as in *Edwards* and *Johnson*, Mr. Plasencia's period of good behavior during pretrial release and the amount of time which was passed since the offense conduct occurred provides the Court with a reliable indicator of what to expect.

The Supreme Court has also emphasized the extreme importance of post-offense rehabilitation by concluding that this type of positive conduct may also justify a downward variance, noting, "post-sentencing rehabilitation evidence may be highly relevant to several § 3553(a) factors that district courts are required to consider at sentencing…Most fundamentally, that evidence provides the most up-to-date picture of his 'history and characteristic' and 'also sheds light on the likelihood that…[the defendant]…will engage in future criminal conduct, a central factor that district courts must assess when imposing sentence." *Pepper v. United States*, 562 U.S. 476, 477-478 (2011).

Therefore, in the instant case, Mr. Plasencia's significant period of post-offense rehabilitation, and good behavior since the offense conduct, is a reliable indicator to the Court that he is unlikely to recidivate and further supports the proposed non-custodial sentence.

## IV.   GOALS OF SENTENCING

### A. The Proposed Sentence Reflects The Seriousness of the Offense, Promotes Respect For the Law, and Provides Just Punishment Given Mr. Plasencia's Role And His Unique § 3553(a) Factors

The proposed sentence of three years of supervised release meets all the goals of sentencing because Mr. Plasencia is not like other defendants in this case nor is he like

28

similarly situated defendants.  It reflects the seriousness of the offense, promotes respect for the law, and provides just punishment particularly given his specific and discrete role in the case.  As explained more in-depth above, he has already experienced significant and severe punishment: he has lost his medical license, his clinic, and his career - his livelihood.  Mr. Plasencia is also a convicted felon which carries its own unique and real stigma.  His job prospects will be severely limited for the rest of his life.  Further, he and his family's life have been threatened time and time again and his reputation has been forever ruined.

The mistakes Mr. Plasencia made in this case are serious.  They also destroyed everything he fought for since he was fourteen and the consequences from these mistakes will follow him for the rest of his life.  Therefore, a prison sentence is not needed, nor justified.  Furthermore, a thirty-six month period of supervised release will greatly restrict his freedom and closely monitor his every step which will also ensure no future lapses in judgement.  And as the Court is aware, he can be ordered to home confinement, home detention, or electronic monitoring, if the Court feels additional punishment is necessary.

### B.  The Proposed Sentence Is More Than Adequate to Meet Goals of Specific And General Deterrence

#### 1.  Specific Deterrence

In terms of specific deterrence, Mr. Plasencia has no prior criminal history.  He is a true zero point offender in Criminal History Category 1 which means he is already statistically unlikely to recidivate as evidenced by his prior 41 years of spotless conduct.  Further, he has already surrendered his license and is not practicing medicine anymore.  Mr. Plasencia is no longer in a position to make the same treatment mistakes he made in the past.  Further, as noted above, he has taken a medical ethics and recordkeeping classes to learn from his mistakes so that he never ends up in this situation again.  This all means that the goal of specific deterrence has been met and no additional punishment is necessary to deter Mr. Plasencia from future misconduct.  All the above, in conjunction

1    with the fact that he is a true first-time offender shows that the proposed sentence more

2    than adequately meets the goal of specific deterrence.

3              **2.  General Deterrence: The Message Is Loud and Clear**

4              Further, in terms of general deterrence, the message has already been sent loud

5    and clear to potential future offenders—Mr. Plasencia has lost his ability to practice

6    medicine and is a convicted felon.  This is news which is widely known and has been

7    disseminated in the media all over the world.  It is hard to imagine a cautionary tale that

8    could send a harsher message - or provide more general deterrence - to future medical

9    providers.  Additionally, it is well-known that imposing a prison sentence does not

10   promote general deterrence and does not curb recidivism rates.  Specifically, the National

11   Academy of Sciences (NAS) concluded that "insufficient evidence exists to justify

12   predicating policy choices on the general assumption that harsher punishments yield

13   measurable deterrent effects."[2]  For this reason, the National Institute of Justice of the

14   U.S. Department of Justice ["DOJ"] found that "[i]ncreasing the severity of punishment

15   does little to deter crime…sending an individual convicted of a crime to prison isn't a

16   very effective way to deter crime."[3]  Therefore, the proposed sentence meets the goal of

17   general deterrence as well because the sentence, and its collateral consequences, clearly

18   and harshly conveys to doctors the severe penalties they face should they make similar

19   mistakes: they will lose their career and their livelihood.

20           **C.  The Proposed Sentence Will Also Avoid Unwarranted Sentencing
                 Disparity Because Mr. Plasencia Is Highly Distinguishable From Co-
21               Defendants Iwamasa, Sangha, And Chavez**

22           The proposed sentence also avoids unwarranted sentencing disparity because Mr.

23   Plasencia has highly unique mitigating factors which set him apart from the others and

24   _____

25   [2] Dr. Oliver Roeder, Laurne-Brooke Eisen, and Julia Bowling, Brennan Center for Justice, *What
     Caused the Crime Decline?* at fn.7 (2015)*; see also* Valerie Wright, *Deterrence in Criminal
     Justice: Evaluating Certainty v. Severity of Punishment*, The Sentencing Project (2010).

26   http://www.sentencingproject.org/doc/Deterrence%20Briefing%20.pdf (finding that severity of
     the sentence does not deter more effectively than the certainty of punishment.)

27   [3] National Institute of Justice," *Five Things About Deterrence* (Sept. 2014),
     http://www.nij.gov/five-things/pages/deterrence.aspx,*available at*,

28   https://ncjrs.gov/pdffiles1/nij/247350.pdf.

1   support the requested sentence.  His conduct also differs profoundly from that of his co-

2   defendants.  Mr. Plasencia is not a drug trafficker, street-dealer, or someone who made a

3   profit from the sale of street drugs.  He did not treat other patients with ketamine and had

4   not previously been investigated by the DEA for questionable controlled substances

5   practices.  He treated M.P. for a discrete thirteen-day period in the physician-patient

6   context for depression.  Despite the serious treatment mistakes he made, Mr. Plasencia

7   was not treating M.P. at the time of his death and he did not provide him with the

8   ketamine which resulted in his overdose.

9   **1. Co-Defendant, Jasveen Sangha**

10       Jasveen Sangha  ("Sangha") is a street-level, drug dealer who possessed and sold a

11  variety of illegal drugs in significant quantities, including methamphetamine, MDMA,

12  cocaine, and ketamine.  She is not, and never was, a medical professional.  She pleaded

13  guilty to five felonies, including maintaining a drug-involved premises, multiple counts of

14  ketamine distribution, and distribution resulting in death and serious bodily injury.  At the

15  time of the offense conduct, she had been operating a full-scale, profit-driven, drug-

16  dealing enterprise out of her home in North Hollywood for almost five years.  Her drug

17  dealing enterprise was organized and set up so that buyers could deposit money and

18  retrieve the drugs they purchased from a lockbox she kept outside of the home.  Notably,

19  DEA agents recovered approximately 1.7 kilograms of methamphetamine tablets, 79 vials

20  of liquid ketamine, MDMA, counterfeit Xanax, cocaine, and cash from her home.  Sangha

21  also maintained typical drug dealer tools of the trade, such as drug packaging materials

22  and a money-counting machine.  (*United States v. Sangha*, CR 24-236-SPG-1, Dkt. 85,

23  10-11).

24       Most notably, and tragically, M.P. was not the only victim who died from the street

25  drugs Sangha sold.  Five years earlier, in August 2019, Ms. Sangha sold ketamine to

26  victim, C.M., who overdosed and died.  Despite C.M.'s death, Sangha did not stop dealing

27  drugs and did not even stop selling ketamine on the street.

28

Sangha also worked directly with co-conspirator Erik Fleming – her middle-man dealer – in order to supply fifty (50) vials of ketamine to M.P. in October 2023.  This is over double the quantity that Mr. Plasencia administered, or left, during his treatment sessions with M.P.  Further, after learning of M.P.'s death, Sangha called Fleming over the encrypted Signal app and instructed him to "delete all our messages," an intentional effort to permanently erase evidence of her involvement and to cover up her role in M.P.'s death.  (*United States v. Sangha*, CR 24-236-SPG-1, Dkt. 85, 13:13-14).  Unlike Sangha, Mr. Plasencia is not a street drug dealer and played no role in a larger drug distribution chain.  He did not sell ketamine (or any drug) on the streets or to other individuals.  He had no contact with Sangha, or her middle-man dealer, Fleming, and had no financial stake in street drug profits.  Mr. Plasencia did not even treat any other patients with ketamine.  Moreover, he was not treating M.P. at the time of his death and did not provide him with the ketamine which caused his death.  The mistakes which Mr. Plasencia made during his medical treatment of M.P., while significant, are entirely distinguishable in nature and degree from Sangha's large-scale, profit driven drug trafficking operations – her specialized trafficking in ketamine even earned her the street moniker, "The Ketamine Queen."  The proposed sentence would appropriately account for Mr. Plasencia's highly distinguishable role, particularly as compared to Sangha, and avoid unwarranted sentencing disparity.

### 2. Related Case, Defendant Mark Chavez

In September 2023, Dr. Chavez was a physician with 20 years of experience who had previously run a ketamine clinic in San Diego called Dreamscape Ketamine.  He had significant hands-on experience with the off-label use of ketamine and had worked in this off-label space for years before leaving the clinic.  As Dr. Chavez told investigators, he had acted as a mentor to Mr. Plasencia for at least twenty years, since they had met when Mr. Plasencia was a medical student at UCLA.  And as Dr. Chavez admitted in his plea, he "knew" that Mr. Plasencia "had little, if any, experience treating patients with ketamine."  (*United States v. Chavez*, Case No. 24-492-SPG, Dkt. 3, 11: 14-15).

On September 30, 2023, unbeknownst to Mr. Plasencia, when he reached out to Dr. Chavez for advice, Mr. Chavez had already severed ties with Dreamscape after a falling out approximately two months earlier for stealing multiple vials of ketamine and midazolam vials from a locked storage box at the clinic.  (Exh. D, Bates 35461-35469). Dr. Chavez also had fraudulently obtained ketamine lozenges in the name of one of his former patients, V.B., without her knowledge and consent – a patient who had never been prescribed ketamine for treatment.  Specifically, Dr. Chavez submitted the fraudulent prescription in V.B.'s name to a pharmacy, misused his DEA registration, and received 200 mg ketamine lozenges in exchange.  Furthermore, when questioned about how the lozenges were obtained, whether the patient knew about the prescription, and what happened to them, Dr. Chavez lied to LAPD, then he lied to the DEA, and then he lied in a proffer with the U.S. Attorney's office.  (Exh. D, Bates 37431-37433, DEA Report of Investigation re: Proffer of Dr. Chavez 4/4/24).

When Mr. Plasencia treated M.P., he did not know that Dr. Chavez was actively engaged in unlawful and unethical conduct and was already the target of a separate DEA investigation.  (*Id.*)  Further, when Dr. Chavez first sold ketamine and lozenges to Mr. Plasencia, he did not tell Mr. Plasencia that the lozenges had been fraudulently obtained and prescribed to a former patient without her consent.  Instead, Dr. Chavez blacked out the patient's name on the prescription in an attempt to conceal his fraud.  (Exh. D, Bates 39297, Excerpt from Search Warrant for Mr. Chavez's Residence).

Further, Dr. Chavez admitted to other medical professionals that he had personally obtained ketamine from an international source and injected himself multiple times in random hotels to see what it felt like.  (Exh. D, Bates 35468, Attachment to DEA Report of Investigation re: Case Initiation Mark Chavez).  Lastly, this case is not Mr. Chavez's first run-in with the law or with being accused of mishandling controlled substances.  In 2009, he was arrested for possession of controlled substance in addition to domestic violence.  (Exh. D, Bates 35498- 35504, Arrest Summary).

In terms of compensation, Dr. Chavez made less money overall than Mr. Plasencia; however, that disparity is readily explained by the fact that Mr. Plasencia personally treated M.P. and traveled to M.P. to provide concierge medical treatment. Naturally, the fee for such in-person, on-demand, patient treatment would be significantly more expensive. It encompasses special accommodations, such as round-the-clock availability at inconvenient hours, hands-on care, and administering the prescribed medication. Despite the difference in compensation, the numerous aggravating factors listed above which relate to Dr. Chavez's personal conduct, history and background sharply distinguish Mr. Plasencia and justify the proposed sentence.

Mr. Plasencia has no prior criminal history of any kind, whether related to controlled substances or otherwise. He was not being investigated by the DEA for misconduct at the time he treated M.P. Mr. Plasencia did not obtain fraudulent ketamine prescriptions without his patient's consent or submit false DEA forms. He has never obtained ketamine for personal use or personally abused it. Additionally, unlike Dr. Chavez, Mr. Plasencia lacked the specialized knowledge, background, and experience that Dr. Chavez had in the field of ketamine treatment. As such, the Court would be well within its discretion to impose a non-custodial sentence to account for Mr. Plasencia's unique and distinguishable role and to avoid sentencing disparity.

### 3.  Related Case, Defendant Kenneth Iwamasa

Kenneth Iwamasa ("Iwamasa"), M.P.'s personal assistant, was acutely aware of M.P.'s ongoing struggles with drug abuse and addiction. He interacted with M.P. on a daily basis, had worked for him for more than twenty-five years, and was tasked with numerous responsibilities related to M.P.'s medical care. He knew in detail, as shown in his notes, how much ketamine M.P. was used to taking, how many different doctors he was seeing, and how high his tolerance had become. He also personally injected M.P. with significant quantities of ketamine, not just on the night that M.P died, but on multiple prior occasions as well. And, of course, it was Iwamasa who administered the fatal dose that directly caused M.P.'s death.

DEFENDANT PLASENCIA'S SENTENCING POSITION

1    Iwamasa also made the ill-fated decision in mid-October 2023, after Mr. Plasencia

2    had stopped treating M.P., to turn to street-level drug dealers for ketamine rather than to

3    work with medical professionals.  He initially coordinated with Fleming – the middle-man

4    who worked with street dealer Sangha – to obtain a sample of the ketamine for M.P.'s

5    approval before negotiating a deal with Fleming for fifty vials.  Thereafter, Iwamasa

6    continued to personally inject M.P. with the street-dealer's ketamine despite knowing the

7    clear risks associated with buying drugs off the street and not from a valid medical source.

8    Iwamasa injected M.P. with approximately six-to-eight shots per day.  And during this

9    same time period, Iwamasa found him unconscious on at least two occasions.  Despite

10   these disturbing warning signs, Iwamasa did not stop injecting M.P. with ketamine.

11   (*United States v. Iwamasa*, CR 24-408-SPG, Dkt. 20, 17: 20-25).  Importantly, Iwamasa's

12   conduct bears the most direct causal connection to M.P.'s death even if the government

13   recommends leniency based on his cooperation under U.S.S.G. § 5K1.1.

14   Following M.P's death, Iwamasa also attempted to conceal his role by hiring a

15   "cleaner" to remove and destroy evidence from the home implicating him in M.P.'s death,

16   including ketamine packaging and some of his handwritten notes related to injecting M.P.

17   with ketamine.  He also called Fleming to report that he had cleaned up the crime scene of

18   ketamine vials and syringes and had also "deleted everything."  (*United States v. Fleming*,

19   CR 24-417-SPG, Dkt. 9, 17:10-14).

20   In sharp contrast, Mr. Plasencia was not treating M.P. at the time he died and did

21   not provide the ketamine which resulted in his death.  His involvement ended weeks prior

22   to M.P.'s passing.  Unlike Mr. Iwamasa, who knew M.P. extremely well, and who

23   interacted with M.P. on a daily basis for years, Mr. Plasencia had no prior experience or

24   personal knowledge of the extent of M.P.'s drug abuse and addiction.  While Mr.

25   Plasencia recognizes that he ignored the warning signs of addiction and should have

26   exercised greater caution, his understanding of M.P.'s addiction was necessarily limited to

27   the brief two-week treatment period.

28

DEFENDANT PLASENCIA'S SENTENCING POSITION

1   Mr. Plasencia accepts full responsibility and truly regrets that his professional

2   decisions played a part in this tragedy.  However, in light of the central and aggravating

3   role which Iwamasa played in M.P.'s death, the proposed sentence appropriately reflects

4   Mr. Plasencia's relative, and significantly lesser culpability, and avoids unwarranted

5   sentencing disparity.

6       **4.  Related Case, Defendant Erik Fleming**

7       Erik Fleming ("Fleming"), is a street-level, drug dealer who is not a medical

8   professional.  He sourced his street ketamine from a larger drug dealer, Sangha, and

9   assisted her in illegally distributing drugs for profit.  He "advertised" to potential buyers

10  by emphasizing how the ketamine he distributed to others was extremely high quality and

11  how his source (Jasveen Sangha) only dealt with high-end celebrities. (*United States v.*

12  *Fleming*, CR 24-417-SPG, Dkt. 9, 12:12-15).  In October 2023, Flemming initially

13  provided a sample vial of ketamine to Iwamasa.  Shortly thereafter, he sold Iwamasa

14  twenty-five vials of ketamine and then about ten days later, an additional twenty-five, for

15  a total of fifty (50) vials.  For each transaction, he took a "cut", which he referred to as a

16  "logistics fee", reflecting that he was delivering and distributing the drugs for profit.  He

17  also explained to Iwamasa over text that he was delivering and distributing the drugs in

18  order to make money for himself.  (*Id*. at 13: 4-6).

19      It was the ketamine provided by Fleming – one of the fifty vials - which led to

20  M.P.'s overdose and death.  Ultimately, Mr. Fleming pleaded guilty to death-resulting

21  distribution conduct because his drugs directly caused M.P.'s overdose.  As such, Mr.

22  Fleming's role is directly and proximately linked to M.P.'s death in a way that Mr.

23  Plasencia's is not.  It is reasonable for the Court to impose the proposed sentence because

24  unlike Fleming, Mr. Plasencia's actions did not directly cause M.P.'s death.

25      Mr. Plasencia's actions are highly distinguishable from the above-defendants.

26  Additionally, his § 3553(a) circumstances are very unique.  He is simply not comparable

27  to the other defendants in this case, nor defendants charged with the same offense conduct

28  around the country.  The proposed sentence reflects Mr. Plasencia's unique, specific, and

DEFENDANT PLASENCIA'S SENTENCING POSITION

1    limited role, accounts for his individual § 3553(a) factors, and remains "sufficient, but not

2    greater than necessary" to meet each and every goal of sentencing.

3    ## V.    <u>CONCLUSION</u>

4        Mr. Plasencia has made real sacrifices for the mistakes he made in this case.  He

5    paid the heavy price of giving up the medical license he worked his entire childhood to

6    obtain.  He lost the clinic he devoted his career to building for the benefit of an

7    underserved community.  Yet, true to form, he has not given up. He is channeling the

8    same grit and determination that carried him out of poverty into his new reality, now

9    focused almost entirely on caring for his young son and rebuilding his life.  As he states in

10   his interview, "I want him to be proud of his father. I made mistakes, but I want him to

11   know that I tried to make better choices after my mistakes." (Mitigation Video, Salvador

12   Plasencia, 8:47 - 9:17).

13       Mr. Plasencia respectfully asks the Court to allow him this opportunity for

14   redemption: the opportunity to remain present for his young son, to continue making

15   amends out in the community rather than from behind prison walls, and to rebuild a law-

16   abiding and productive life from the ruins of his mistakes.

17
18                                    Respectfully submitted,

19   Dated:  November 19, 2025         */s/ Debra S. White*
                                       DEBRA S. WHITE
20                                     KAREN L. GOLDSTEIN
                                       Attorneys for Salvador Plasencia
21
22
23
24
25
26
27
28

DEFENDANT PLASENCIA'S SENTENCING POSITION

1

2

**PROOF OF SERVICE**

3         I, Karen Goldstein, declare at the time of service I was at least 18 years of age and

4    not a party to the legal action.  My business address is: 1800 N. Vine Street, Los Angeles,

5    CA 90028.  My telephone number is 888.445.6313.  I am employed in the office as a

6    member of the bar of this Court at whose direction this service was made.

         On November 19, 2025, I served the foregoing document described as

7    **DEFENDANT SALVADOR PLASENCIA'S SENTENCING POSITION AND**

8    **EXHIBITS IN SUPPORT** on all interested parties in this action as follows:

9

10   **X            BY EMAIL**

11

12   **Email:**
     **Ian.Yanniello@usdoj.gov**

13   **Haoxiaohan.Cai@usdoj.gov**

         I certify under penalty of perjury under the laws of the State of California that the

14   foregoing is true and correct.

15       Executed on this 19th day of November  2025 in Los Angeles, California.

16

17                                    */s/ Karen L. Goldstein*
                                      KAREN L. GOLDSTEIN, ESQ.
18                                    Attorney for Salvador Plasencia

19

20

21

22

23

24

25

26

27

28

38

DEFENDANT PLASENCIA'S SENTENCING POSITION